IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:17-CR-226** |
| | : | |
| **v.** | : | |
| | : | |
| **ERNEST KYLE DYER** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

Before the court is the motion to suppress (Doc. 107) filed by Defendant Ernest Kyle Dyer ("Mr. Dyer" or "Defendant"). Having considered the briefing submitted by the parties, the documentary evidence, and the testimony of the officers, the court will grant the motion in part and deny the motion in part.

## I.    <u>Background</u>[1]

On July 5, 2017, Starr Bowman called 911 to report that that she had been physically attacked by her boyfriend, Ernest Dyer. York county officers Joshua Phillips and Po Engle located Ms. Bowman at the Sunoco gas station on North Sherman Street in York.[2] There, she told them—both orally and through a written statement—that she lived at 515 South Queen Street with Mr. Dyer. According to

---

[1]    The court's factual findings are based on the documentary evidence submitted by the parties and testimony elicited from officers during an evidentiary hearing. The facts regarding Mr. Dyer's conduct are introduced solely for the sake of deciding this motion and are not binding factual findings for trial.

[2]    Special Agent Ryan Anderson eventually arrived on scene but did not ask Ms. Bowman questions.

Ms. Bowman,[3] Mr. Dyer had been sexually trafficking her and a woman named Summer Bechtold, sometimes out of his house and other times at a motel, despite being a convicted felon under house arrest. Mr. Dyer paid Ms. Bechtold in drugs, and sometimes used drugs and violence to coerce the women, but stopped trafficking Ms. Bowman upon her request. Ms. Bowman continued to help Mr. Dyer manage the women by feeding, transporting, and disciplining them. Ms. Bowman stated that Mr. Dyer was violent, previously assaulting her by pouring cooking oil on her vehicle and attempting to set it ablaze while she and her children were inside.

Before calling the police, Ms. Bowman had gone to her neighbor's house looking for a prescription bottle of thyroid medication that belonged to her. Upon returning to her home, she and Mr. Dyer began arguing and, as their conflict escalated, he brandished a forty caliber Hi-Point pistol and struck her in the left eye with it.[4] Ms. Bowman stated that she was familiar with the weapon because Mr. Dyer's mother had purchased it on his behalf, he frequently fired the gun in the backyard, and he kept it in an orange backpack by his night stand. Ms. Bowman informed police that, in response, she fled and began receiving calls from Mr. Dyer,

---

[3] The majority of the facts recited herein regarding Mr. Dyer's conduct are testimony from Ms. Bowman, not the court's finding of undisputed facts.

[4] There is a factual dispute as to whether this happened early in the morning or later in the day.

telling her she should return to the house "with a body bag." As a result, she contacted the police.

Ms. Bowman also made several other statements not directly related to the altercation, including that Mr. Dyer hired men to rape her as punishment, and that she knew they were hired because they would say things during the assault that only Mr. Dyer could know. She claimed Mr. Dyer paid off police, such that when she would call in, police would arrive, dismiss her claims, then leave. She believed that when she would take taxi cabs, the drivers would be hired by Mr. Dyer and would report to him. She stated that Mr. Dyer had once choked a woman until she was unconscious while having sex with her in the house, potentially killing her. Ms. Bowman also told police Mr. Dyer had murdered people in New Jersey.

The police examined Ms. Bowman's eye and took photographs of it, concluding she had swelling and injuries consistent with Mr. Dyer having struck her in the face. They also followed up on her explanation of how Mr. Dyer acquired the handgun, confirming that his mother had in fact gone to a gun store and purchased the exact pistol Ms. Bowman claims Mr. Dyer struck her with. The officers confirmed Mr. Dyer was a convicted felon thus barring him from legally possessing a firearm. They also confirmed Ms. Bowman's car had burn marks. The police, however, took no efforts to corroborate Ms. Bowman's claims that Mr. Dyer was offering drugs to his prostitutes, nor did they follow up on what were likely some of

the worst crimes she accused him of—murdering multiple people, paying a man to rape her, attempting to murder her and her children, and paying off police.

This information was at some point relayed to Special Agents Donald Asper and Angela Strauss, who proceeded to conduct their own interview of Ms. Bowman. On July 6, 2017, Agents Asper and Strauss transmitted that information to Detective Mark Baker. He proceeded to rely upon it in drafting an affidavit and warrant application to submit to a York County Magisterial Judge. He listed the following information in his affidavit:

1. Your affiant, Detective Mark Baker, is a sworn police officer with the Northern York County Regional Police Department (NYCRPD) and has been so employed by this agency for 13 years. Your affiant is a member of the criminal investigation division and a Task Force Officer with the Federal Bureau of Investigation (FBI). Your affiant is also a sworn Special County Detective for the District Attorney's Office.
2. On 7/6/2017, your affiant was contacted by Special Agent (SA) Donald Asper from the FBI regarding an incident which had occurred last evening involving Starr Bowman.
3. Your affiant spoke with SA Asper who indicated a female in York City was assaulted by a male identified as ERNEST DYER.
4. A copy of the incident report taken by York City including the victim's written statement was forwarded this officer for review.
5. On 7/5/2017, Starr Bowman indicated she had left her dwelling to go to a neighbor's house to get some prescription medications which were hers.
6. Bowman advised she lives at 515 South Queen Street in York City with her boyfriend, ERNEST DYER.
7. Bowman indicated when she returned to the house, a verbal altercation ensued between her and DYER.
8. During the altercation, DYER brandished a Highpoint .40 caliber pistol and struck Bowman in the left eye with the gun.
9. Bowman then indicated DYER pointed the pistol at her.

10. Bowman indicated she fled the residence to an undisclosed location.
11. Bowman further advised after the incident, DYER started to threaten her via phone stating things such as "bring a body bag"
12. Bowman stated DYER has threatened her life in the past and she currently fears for her safety.
13. Bowman advised approximately two weeks prior, another verbal altercation ensued with DYER and during this, he poured cooking oil on her vehicle, which contained her 12-year-old and 5-year-old children.
14. Bowman advised DYER then tried to light the oil on fire while her children were still in the vehicle.
15. Bowman contacted the York City Police Department who responded and conducted an initial investigation.
16. Photographs were taken of the injuries to Bowman by York City Police which included a bruised area around her left eye and considerable redness and swelling.
17. On 7/6/17, an interview was conducted by SA Donald Asper and SA Angela Strauss of Starr Bowman.
18. Bowman confirmed the above account as stated the previous night.
19. Also during the interview, Bowman disclosed there may be illegal drugs located in the residence.
20. A search was done of the criminal history of ERNEST DYER and it was discovered based on his past record, DYER is a person not to possess a firearm.
21. Based upon above information, your affiant requests a search warrant be issued for the residence of ERNEST DYER for the aforementioned items listed on page 1.

(Doc. 116-2, pp. 3-4.) Detective Baker included in the application a request for authorization to seize three categories of items during the search: "Firearms, illegal drugs, cell phones possessed or belonging to Ernest Dyer." (Doc. 116-2, p.2.) At 8:40 that evening, Magisterial Judge Barry Bloss signed the warrant.

The next day, Detective Baker executed the search warrant at 515 South Queen Street, along with, among others, Special Agent Ryan Anderson. Upon entering the

home, the officers found Mr. Dyer and Summer Bechtold in bed together. In other parts of the house, police located Mr. Dyer's mother and son, Annie Dyer and Raekwon Grant. They handcuffed Mr. Dyer. They then realized there was a bench warrant out for Ms. Bechtold's arrest, so the officers handcuffed her as well. Upon questioning, Mr. Dyer led police to a vacuum in the kitchen closet where a forty-caliber Hi-Point handgun was located. Police proceeded to continue searching the house for contraband and ended up seizing the following items:

(1) 1 HiPoint .40 S/N X7259647 with 10 rounds, Magazine
(2) 1 Swann DVR and charger
(3) 1 Plastic packaging with Apple brand
(4) 1 $270 USC
(5) 1 $36 USC
(6) 1 Silver LG Cell Phone
(7) 1 Gray LG Cell Phone
(8) 1 Silver LG Cell Phone with cracked Screen
(9) 1 Trac phone
(10) 1 Drug paraphernalia
(11) 1 Black padfolio with paperwork and receipt book
(12) 1 Box containing green pills and packaging material and ID for T. Holmes
(13) 1 Multiple [sic] boxes of .40 caliber ammunition (106 bullets)
(14) HiPoint gun box with Gander Mountain receipts
(15) 1 2 [sic] Flash Drives
(16) 1 Alcatel cell phone
(17) 1 Belly Band type pistol holster
(18) 1 Black pistol holster
(19) 1 Clear empty sandwich bags from freezer

(Doc. 116-2, p. 6.)[5]

---

[5] Because the warrant did not list the Swann DVR and charger, plastic packaging with Apple brand, cash, drug paraphernalia, black padfolio with paperwork and receipt book, box containing

Mr. Grant and Ms. Bechtold were subsequently brought into custody. Ms. Bechtold informed police that, during the transport, Mr. Grant said the police had missed a bottle of pills that he had left on an outer window sill at the house.

On July 7, 2017, the United States Attorney's Office for the Middle District of Pennsylvania filed a criminal complaint against Mr. Dyer in the United States District Court for the Middle District of Pennsylvania. On July 13, 2017, Special Agent Ryan Anderson submitted an application for a second warrant to United States Magistrate Judge Martin Carlson. In a thorough affidavit, Mr. Anderson laid out the foundations of the investigation into Mr. Dyer and the police's basis for believing he was keeping drugs as part of a sex trafficking operation. He also relayed Ms. Bechtold's statement that officers would be able to find a bottle of drugs on a window sill in the house. Judge Carlson subsequently issued the requested warrant. On July 14, 2017, Mr. Anderson executed the warrant, discovering two children of Mr. Dyer and two women now living in the house. Upon searching the window sill Ms. Bechtold directed him towards, he located a bottle of drugs.

On July 26, 2017, a grand jury indicted Mr. Dyer for one count of felon in possession of a firearm. On March 14, 2018, a grand jury indicted Mr. Dyer for one count of a felon in possession of a firearm, one count of possession of a firearm in

---

green pills and packaging material and ID for T. Holmes, flash drives, and empty sandwich bags, the court only discusses these items in its section on the plain view doctrine.

furtherance of drug trafficking, one count of criminal conspiracy to distribute and possess with the intent to distribute pentylone, and one count of distribution and possession with the intent to distribute a controlled substance.

On May 10, 2019, Defendant filed a motion to suppress, seeking the exclusion of all evidence acquired during both searches on multiple grounds. (Doc. 107.) On June 5, 2019, the United States submitted its brief in opposition. (Doc. 114.) On August 13, 2019, the court held an evidentiary hearing on the motion to suppress, hearing testimony from the two affiants, Detective Mark Baker and Special Agent Ryan Anderson. (Doc. 127.) On September 19, 2019, Defendant filed supplemental briefing in support of his motion, incorporating facts revealed during the evidentiary hearing. (Doc. 140.) On October 17, 2019, the United States submitted its own supplemental briefing on the matter. (Doc. 149.) Having fully reviewed the briefs, case law, testimony, and all other evidence in the record, this motion is now ripe for resolution.

## II.  <u>Standard of Review</u>

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).[6] "[T]he

---

[6]    The United States claims that *Franks v. Delaware*, 438 U.S. 154, 156 (1978) stands for the proposition that a "search with a search warrant is presumed lawful, and the preliminary burden is on the defendant to invalidate it by defeating its presumption of regularity." (Doc. 114, p. 7.) This

controlling burden of proof at suppression hearings" is "a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The Fourth Amendment to the United States Constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the United States Supreme Court has repeatedly held, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Generally for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356-57 (1967)).

An officer properly acquires a warrant by submitting an affidavit to a magistrate judge providing a sufficient factual basis from which the magistrate judge can reasonably infer that "there is a fair probability that evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause is something less than a prima facie showing, but requires, at least,

---

is incorrect. *Franks* established that the facts stated in a search warrant affidavit are presumed true unless the defendant makes a preliminary showing that they may be false. *Franks*, 438 U.S. at 171 ("There is, of course, a presumption of validity **with respect to the affidavit** supporting the search warrant.") (emphasis supplied); *United States v. Aviles*, 938 F.3d 503, 508 (3d Cir. 2019) ("In *Franks*, the Supreme Court held that a defendant has a right to challenge the veracity of statements made in an affidavit of probable cause that supported the issuance of a warrant. . . . [as long as they] make a substantial preliminary showing that the affidavit contained a false statement or omission[.]") (internal quotations omitted). But an affidavit or warrant can be insufficient on its face without the defendant presenting any evidence.

"a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.* at 235, 237 (internal quotations, ellipses, and brackets omitted). In evaluating the magistrate judge's finding of probable cause, the district court should defer to the magistrate judge's judgment. *Id.* at 236. "This, however, does not mean that reviewing courts should simply rubber stamp a magistrate's conclusion." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (internal quotations omitted). For example, the magistrate judge cannot rely upon a "wholly conclusory statement" by the affiant, as such a statement "gives the magistrate virtually no basis at all for making a judgment regarding probable cause." *Gates*, 462 U.S. at 238-39. Instead, "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued," and evaluate whether the magistrate judge had a "substantial basis" for concluding probable cause existed justifying the issuance of a warrant. *Id.*

In addition to challenging the sufficiency of the affidavit, "a defendant may attack the issuance of a warrant if based on untruthful information." *United States v. Harvey*, 2 F.3d 1318, 1323 (3d Cir. 1993) (citing *Franks*, 438 U.S. at 165, 171). A successful truthfulness attack must show, through evidence, that the police put forward false facts either deliberately or through a reckless disregard for the falsity of the facts. *Id.*

### III.   **Discussion**

There are three bases upon which the government could have permissibly seized evidence during its searches of Mr. Dyer's home: (1) pursuant to a properly issued warrant; (2) pursuant to the good-faith reliance upon an improperly issued warrant; and (3) pursuant to the plain view doctrine.  The court begins by dispensing of arguments that did not affect its analysis and proceeds to address each possible legal justification in turn.

**A. Defendant's statement inconsistency and hearsay attacks do not effectively problematize either warrant.**

Defendant raises two lines of objections that the court can preliminarily dispose of.  First, Defendant complains that the search warrant affidavits rely on lines of hearsay.  Second, Defendant raises several attacks on Ms. Bowman's inconsistencies and biases in her statements.  Here, Defendant is correct that the affidavits in support of the search warrants relied upon multiple layers of hearsay, and Defendant marshals some decent attacks on the consistency of Ms. Bowman's statements.  Defendant, however, does not explain in his brief what the *legal* implications of these attacks are, leaving the court to do its best to connect the dots.[7] Neither of these arguments mount an effective attack on either warrant.

---

[7]   This is, indeed, a general problem with Defendant's briefing—it reads like a story with very little explanation as to how the facts play into the legal attacks he raises against the warrant and affidavit and with little attempt to directly address various legal arguments raised by the United

To begin, Defendant does not claim any of the statements in the affidavit are false.  As such, the court need not evaluate whether the police conducted an adequate investigation to support the statements made in the affidavit.  Instead, the court will "confine" its review "'to the facts that were before the magistrate judge, i.e., the affidavit, and [will] not consider information from other portions of the record.'" *United States v. Miknevich*, 638 F.3d 178, 181-82 (3d Cir. 2011) (quoting *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993)).  Here, Defendant has not raised a viable attack on the consistency of either the statements by Ms. Bowman or Ms. Bechtold that were included in the affidavits in support of the first and second warrant.  The court thus turns to Defendant's hearsay objection.

An officer drafting an affidavit in support of a warrant application can generally rely upon hearsay that would be inadmissible at trial, as long as the officer has "a substantial basis for crediting the hearsay."  *Gates*, 462 U.S. at 241-42 (internal quotations omitted); *accord DeAngelo v. Yeager*, 490 F.2d 1012, 1014 (3d Cir. 1973) ("[A]lthough an affidavit (submitted to support the issuance of a search warrant) may be based on hearsay information . . . the magistrate must be informed on some of the underlying circumstances from which the informant concluded that evidence of crime was to be found in the place to be searched.").  Further, when the

---

States, such as the plain view doctrine and good-faith exception.  The court is thus left to resolve these on its own.

hearsay statements are made by fellow law enforcement officers, they are generally deemed trustworthy, unless the defendant marshals evidence demonstrating the statements were unreliable and merited further corroboration. *Compare United States v. Harvey*, 2 F.3d 1318, 1324 (3d Cir. 1993) (holding defendant's failure to put forward evidence demonstrating lack of reliability by fellow officer's statement warranted rejection of hearsay challenge), *with Zimmerman*, 277 F.3d at 430 n.3 (distinguishing *Harvey* and finding defendant's hearsay challenge was meritorious because he put forward evidence showing that the informant herself was merely relaying information she had heard a parent relay from their child); *cf. United States v. Yusuf*, 461 F.3d 374, 385-86 (3d Cir. 2006) ("[I]nformation received from another governmental agency may raise questions as to its accuracy and require an agent to undertake further investigation, and we explicitly decline to adopt a rule that information obtained from a sister governmental agency pursuant to a court order is *per se* reliable.").[8]

The first warrant references that Detective Baker is relying upon a victim statement taken from Ms. Bowman and relayed to him by another officer. Ms.

---

[8] The United States characterizes the law in a much simpler manner, as if an officer can *always* rely on hearsay, including statements by fellow law-enforcement officers, in issuing an affidavit. While the court agrees there is a strong legal presumption in statements made by fellow officers, there is no similar presumption in favor of non-police declarants. And, as shown above, the Third Circuit has held there are circumstances under which reliance on a fellow officer's statement may be deemed unreasonable.

Bowman's statement itself was not hearsay—it was her own testimony of things she directly observed. Detective Baker's reliance upon another officer's statement is hearsay, but, because the declarant is another officer, and Defendant has introduced no affirmative reason to doubt such testimony, Detective Baker's reliance was reasonable.

Turning to the second affidavit, there is an additional level of hearsay here because the affiant relies upon Ms. Bechtold relaying a statement from Mr. Grant regarding the location of drugs previously undiscovered by the police. Here, reviewing the well-detailed affidavit, on the whole, it was reasonable for the affiant to believe Ms. Bechtold relaying Mr. Grant's apparent confessions regarding the location of drugs was reliable. Ms. Bechtold claimed that Mr. Grant was bragging about where he had hidden drugs. In light of the facts that: (1) both of them were in the house and present at the time of the search; (2) Ms. Bechtold said she had been around Mr. Grant repeatedly (as he managed her prostitution); and (3) she was generally familiar with drug use in the house, it was reasonable for the magistrate judge to consider the officer relaying Ms. Bechtold's statement about where Mr. Grant claimed he hid the drugs. Thus, Defendant's hearsay attacks fail to draw the court's attention to any problem in the magistrate judges' analysis.

**B. On the face of the affidavits, the magistrate judge had probable cause to issue the first warrant in search of guns and cell phones**.

The court begins by laying out some uncontroverted facts in the affidavit that supported a finding of probable cause justifying a search for guns and phones, then identifies and sorts the controverted facts on the issue. Here, the first affidavit was sufficient to establish probable cause to search Mr. Dyer's residence for a gun and cell phone. The affidavit states that Ms. Bowman contacted police, claiming she had recently been struck by Dyer in his house with a gun, and that police corroborated this accusation by examining her eye, confirming she appeared to have a fresh injury, and taking photographs of it. The affidavit states Mr. Dyer proceeded to call and threaten to kill her. The affidavit states that police conducted a background check on Mr. Dyer, confirming it was illegal for him to possess a gun. The affidavit also states the altercation took place "when she returned to the house." This leaves two questions for the court in assessing whether there was probable cause to search for a gun in his residence: (1) were there sufficient facts to justify finding Ms. Bowman's testimony on these points reliable; and (2) were there sufficient facts to justify believing there would be contraband in his house. The court addresses each in turn.

In evaluating an affidavit based on an informant's tip, the court must look to the totality of circumstances, focusing on facts showing the overall reliability of the tipster, the veracity of their statement, and the basis of their knowledge. *See Gates*, 462 U.S. at 230-34. "Informants are not presumed to be credible, and the

government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation." *United States v. Yusuf*, 461 F.3d 374, 384-85 (3d Cir. 2006). The corroboration of innocent facts can bolster the trustworthiness of a tip if they nonetheless carry a "degree of suspicion." *United States v. Nelson*, 284 F.3d 472, 479 (3d Cir. 2002) (quoting *Gates*, 462 U.S. at 245 n.13). But "where the tip contains information that later investigation contradicts, or that is of such a general nature as to be easily obtained by any observer, there is no reasonable suspicion." *Id.* An informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand" weighs in favor of the reliability of the tip. *Gates*, 462 U.S. at 234. Informants' statements are more reliable if they claim to have "just witnessed a crime," and if "officers had an opportunity to appraise the witness's credibility through observation." *Nelson*, 284 F.3d at 480.

Here, the government argues Ms. Bowman should be afforded significantly more trust than a typical confidential informant because she directly appeared in front of the police, disclosed her identity, and claimed she was the direct victim of the crime. The court agrees. By presenting herself physically to police while telling her story, they had the opportunity to examine her overall demeanor and make a judgment call regarding her honesty and trustworthiness. And by disclosing her

identity, she exposed herself to being cross-examined at trial and otherwise having her claims subject to additional scrutiny. Moreover, the affidavit states Ms. Bowman claimed to live with Mr. Dyer, to date him, and to have directly experienced the assault and threats she was reporting. Based upon these facts, the magistrate judge could have reasonably concluded that Ms. Bowman was reliable, her injury corroborated, and that she had a sufficient basis of knowledge to make these claims.

Regarding whether the gun could have been located in the house, under Third Circuit precedent, which binds this court, "direct evidence linking the residence to criminal activity is not required to establish probable cause." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002). Instead, the magistrate judge could infer from "an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested." *Id.* The types of circumstantial facts the magistrate judge may infer from frequently include "the type of crime, the nature of the items sought, the suspect's opportunity for concealment," and other inferences about where persons tend to hide contraband. *Id.* (internal quotations omitted). "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Id.* at 103 (internal quotations omitted). Moreover, as long as the warrant "contain[s] the specific address of the house, an exhaustive list of items (including weapons, drugs, and drug paraphernalia), and it name[s] [the

defendant] as an owner, occupant, or possessor of the property," then it properly specifies a particular place "to be searched and the persons or things to be seized." *United States v. Williams*, 720 F. App'x 681, 683 (3d Cir. 2018) (internal quotations omitted).

Here, despite Ms. Bowman having informed the police that Mr. Dyer generally kept his pistol in an orange backpack next to his bed, this information did not make its way into the affidavit. In fact, the affidavit contains no specification regarding where the gun might be. Nonetheless, other facts in the affidavit could have led the magistrate judge to reasonably infer the gun could be located in the house. The affidavit appears to suggest Mr. Dyer attacked Ms. Bowman with a pistol inside of the house, and the police corroborated this attack. The affidavit also states that Mr. Dyer was calling Ms. Bowman instructing her to return to the house, and that he would kill her upon arrival, suggesting he still had the gun at the house. Finally, the affidavit suggested Mr. Dyer lived at the house. Together, a reasonable person could believe the gun was located in the house.

As such, based on the facts in the affidavit, the magistrate judge could reasonably have concluded the police found Ms. Bowman's testimony regarding the gun and phone threat credible. He could also have found a fair probability the gun and cell phones were located in the home the next day, when the warrant was issued.

The magistrate judge thus had probable cause to issue the warrant searching the house for a gun and phone.

### C. The magisterial judge lacked a substantial basis for its finding of probable cause in support of the drug search in the first warrant.

The magistrate judge, however, had no probable cause to issue the warrant in search of drugs. The only line in the affidavit referring to drugs is a conclusory assertion that "Bowman disclosed there may be illegal drugs located in the residence." (Doc. 116-2, p. 4.) From this line, the magistrate judge had no factual basis to conclude that there was a fair probability drugs could be located in the house. The affidavit contains no explanation of what drugs could be found in the house, why they could be found there, or what degree of probability Ms. Bowman or the police assigned to the presence of drugs in the residence. As such, the magistrate judge erred in issuing the warrant justifying a search for illegal drugs. *Gates*, 462 U.S. at 239 ("An officer's statement that 'affiants have received reliable information from a credible person and believe' that heroin is stored in a home, is likewise inadequate.") (quoting *Aguilar v. Texas*, 378 U.S. 108, 109 (1964)); *see, e.g. United States v. Jones*, 818 F. Supp. 2d 845, 850 (E.D. Pa. 2011) (holding an affidavit which relied on "a single bald assertion that [the informant] 'knows Jones to sell drugs to earn money'" was insufficient to establish probable cause).

Before the court can exclude any items acquired during the search, though, it must examine what items the police took based on the illegal drug portion of the

affidavit, and whether the plain view or good-faith doctrine nonetheless justified the items acquired.

### D. The good-faith doctrine did not justify the police seizing drug-related evidence.

Based on the testimony of the officers, and the court's own reasonable inferences from the warrant and seized property, the police seized the following items pursuant to the "illegal drugs" section of the warrant: "plastic packaging with Apple brand"; "$270 USC"; "$36 USC"; "Drug paraphernalia"; "Black padfolio with paperwork and receipt book"; "Box containing green pills and packaging material and ID for T. Holmes"; "Clear empty sandwich bags from freezer." (Doc. 116-2, p. 6.) The court begins its analysis of whether these items should be excluded by examining whether the officers had objectively reasonable good faith in believing the warrant justified these searches.

Under the good-faith exception established in *United States v. Leon*, 468 U.S. 987 (1984), the court cannot exclude evidence obtained through an improper warrant where "police acted in objectively reasonable reliance on the subsequently invalidated search warrant." *Virgin Islands v. John*, 654 F.3d 412, 417-18 (3d Cir. 2011) (internal quotations omitted). The United States bears the burden of establishing that the exception applies. *Jones*, 818 F. Supp. 2d at 849.[9] While

---

[9]    The court did not locate a Third Circuit case on this issue, but several other circuits have held the same. *See, e.g. United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) ("The burden is on the

Defendant fails to address the exception, the United States does not provide a sufficient basis for applying it. The United States argues that the officers' reliance upon a warrant in executing their search is sufficient to satisfy the *Leon* good-faith exception. This cannot be the case. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. State of Ohio*, 379 U.S. 89, 97 (1964). Moreover, if mere reliance upon a warrant was sufficient, it would mean that every time a magistrate judge issued a warrant, the *Leon* exception would be automatically triggered. This would result in the district court functionally "rubber stamp[ing]" the magistrate judge's issuance of a warrant every time, in contravention of Third Circuit law. *Zimmerman*, 277 F.3d at 432. The court is thus left to analyze on its own the record and case law in more depth than the parties have offered.

The applicability of the good-faith test is interwoven with the applicability of the exclusionary rule—a remedy created by courts to effectuate a defendant's right to be free from arbitrary, unconstitutional searches. Thus, to flesh out the parameters

government to demonstrate the objective reasonableness of the officers' good faith reliance."); *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990) (same); *United States v. Brunette*, 256 F.3d 14, 17 (1st Cir. 2001) (same); *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986) (same); *but see United States v. Guerrera*, No. 2:17-CR-137, 2018 WL 8805227, at *4 (N.D. Tex. Oct. 3, 2018) ("When challenging the application of the good faith exception, Defendant carries the burden to prove by a preponderance of the evidence that it does not apply.") (citing *United States v. Rosa*, 721 F. App'x 403 (5th Cir. 2018)).

of the good-faith exception to the warrant requirement, the court examines under what conditions the exclusionary rule should apply. The Third Circuit has held "exclusion will not deter police from relying on an invalid warrant unless the police should reasonably have known that the warrant's issuance would be found unconstitutional." *John*, 654 F.3d at 418. "When law enforcement 'exhibits "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.'" *United States v. Franz*, 772 F.3d 134, 144 (3d Cir. 2014) (quoting *Davis v. United States*, 564 U.S. 229, 258 (2011)) (internal brackets omitted). "'But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.'" *Id.* (quoting *Davis*, 564 U.S. at 238). "'[P]olice conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Id.* at 145 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). The court must thus apply the exclusionary rule when doing so is "calculated to prevent" future constitutionally-invalid searches, "not to repair" the harm inflicted by one. *United States v. Wright*, 493 F. App'x 265, 271 (3d Cir. 2012) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

There are four circumstances where an officer's reliance upon a warrant will be deemed objectively unreasonable: (1) where the magistrate judge relied upon "deliberately or recklessly false" statements in the warrant affidavit; (2) where the magistrate "abandoned his or her judicial role and failed to perform his or her neutral and detached function"; (3) "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *John*, 654 F.3d at 418.

In applying these exceptions, the court must look to the facts as a whole, *Franz*, 772 F.3d at 144-45, to determine how a reasonable, well-trained officer would have examined the situation, and whether they "would have known that the search was illegal under all of the circumstances." *United States v. Vasquez-Algarin*, 821 F.3d 467, 483 (3d Cir. 2016) (internal quotations omitted). Reasonable officers' "appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers." *United States v. Tracey*, 597 F.3d 140, 152 (3d Cir. 2010) (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)). As such, an officer may reasonably rely upon a technically deficient warrant. *Id.* But an officer may have relied upon a "supporting affidavit [that] was so conclusory that their good faith reliance upon the warrant is obviated." *Cardall*, 773 F.2d at 1133.

The first exception is inapplicable because Defendant has not alleged that any of the statements in the affidavit were false. The second exception is inapplicable because Defendant has not accused either of the magistrate judges of examining the materials with the same heated passion as an investigating officer. And the fourth exception is inapplicable because the warrant contains adequate specifications. *See Williams*, 720 F. App'x at 683. Therefore, the question becomes whether the warrant affidavit was so obviously deficient that any reasonable officer would have realized there was no probable cause to search for drugs. Given the affidavit was devoid of any factual explanation of why the police thought drugs may be in the house, the court finds this exception applicable.

As explained above, the affidavit presents essentially no facts upon which a magistrate judge could have assessed whether there was probable cause to search for drugs. This failure on the affiant's part demonstrates more than a technical deficiency; it is a grossly negligent disregard for the substantive requirement that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Giving magistrate judges the ability to review the facts and make their own judgment calls "is not a mere formality; it ensures that necessary judgment calls are made by a neutral and detached magistrate, not by the officer engaged in the often competitive enterprise of ferreting out crime."

*Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2543 (2019) (internal quotations omitted).

Because this deficiency violates a bedrock of warrant case law, it is significant that

the court deter this police behavior. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d

Cir. 1996) (cited favorably by *Zimmerman*, 277 F.3d at 438) ("For the good faith

exception to apply, the police must reasonably believe that the warrant was based on

a valid application of the law to the known facts. In the instant matter the officers

failed to give these facts to the magistrate.").

Further, the officers executing the warrant cannot in good faith claim to have

simply read the warrant and not the affidavit in support of it. The affidavit was

directly attached to the warrant. And, more importantly, Detective Mark Baker was

both the affiant and one of the officers executing the warrant. This weighs in favor

of finding the police culpable in the error and thus justifying exclusion:

> Good faith is not a magic lamp for police officers to rub
> whenever they find themselves in trouble. And
> particularly where the affiant is also one of the executing
> officers, it is somewhat disingenuous, after having gone to
> the magistrate with the paltry showing seen here, to
> suggest, as the government suggests, that at bottom it was
> the magistrate who made the error and the search and
> seizure are insulated because the officer's reliance on that
> error was objectively reasonable.

*Zimmerman*, 277 F.3d at 438 (internal quotations and citations omitted); *accord*

*United States v. Crist*, 627 F. Supp. 2d 575, 588 (M.D. Pa. 2008) ("In a case such as

this, where the police officers were the source of their own trouble, the good-faith

exception does not apply."); *Reilly*, 76 F.3d at 1281 (holding the good-faith exception is inapplicable "when the officers are themselves ultimately responsible for the defects in the warrant").

Finally, even if additional facts had been supplied, the affiant's phrasing of the issue did not give rise to an inference of probable cause. The contingent nature of Bowman's statement—that there "may" be drugs in Dyer's house, without any further indication of the probability the statement is true—is a type of factual averment that police should know they cannot rely upon. *See United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (holding an affidavit "fell short to an extent precluding good-faith reliance on the warrant" where it said the defendant "might own a cell phone" that "might be found in the residence" and "might retain incriminating" evidence).

Taking all facts into consideration, the court finds the officers' subjective reliance upon the first warrant is not objectively reasonable. The court also finds the police culpable for disregarding a fundamental requirement that they put before the magistrate judge the factual basis for their belief that contraband shall be found in a particular location. These conclusions militate in favor of excluding any evidence of "illegal drugs" acquired by the police pursuant to the first search.

Even if the search for drugs was illegal, however, the police may nonetheless retain any contraband they acquired if it was in plain view during the legal portions of the search.  Hence, the court now turns to the plain view doctrine.

### E. The plain view doctrine only permitted the police to seize the green pills, plastic packaging, and ID card.

The plain view doctrine is a "rule permitting a police officer's warrantless seizure and use as evidence of an item seen in plain view from a lawful position or during a legal search when the officer has probable cause to believe that the item is evidence of a crime."  BLACK'S LAW DICTIONARY 1391 (11th ed. 2019). "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character."  *Horton v. California*, 496 U.S. 128, 135 (1990).  Three conditions must be satisfied for the plain view doctrine to justify the seizure of certain items: (1) "the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed'"; (2) "the incriminating character of the evidence must be 'immediately apparent'"; and (3) "the officer must have 'a lawful right of access to the object itself.'"  *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (quoting *Horton*, 496 U.S. at 136); *accord United States v. Shabazz*, 563 F. App'x 875, 878 (3d Cir. 2014) (same).  The government bears the burden of proving all three of these elements by a preponderance of the evidence.  *See United States v.*

*Scarfo*, 685 F.2d 842, 856 (3d Cir. 1982) ("[T]he plain view doctrine carves out an exception to the warrant requirement."); *California v. Acevedo*, 500 U.S. 565, 589 (1990) (holding a party seeking to invoke an exception to the warrant requirement bears the burden of proof). The Supreme Court has held that discovery of the object in plain view need not be inadvertent, but there is a limit to the intent:

> Nonetheless, even though an officer can keep his or her eye out for particular objects while conducting a lawful search, the Court has made quite clear that the "plain view" doctrine cannot be used to expand the scope of a legal search—there must be "scrupulous adherence" to the requirement that the search be limited to the time and place necessary to find the items listed on the warrant.

*Menon*, 24 F.3d at 560 (quoting *Horton*, 496 U.S. at 138). If the police must manipulate items in a manner that invades the possessory interests of their owners before ascertaining that the object is evidence of contraband, then the items were not plainly viewable. *See Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987).

Here, given the warrant was at least partially valid, the police were constitutionally permitted to be in the home at issue. Thus, whether any particular item was in "plain view" depends on whether the police: (1) were able to see it while searching for the gun and cell phones or securing the house; and (2) if it was "immediately apparent" that the items contained incriminating evidence.

Looking first at the cash seized, the government has put forward no evidence that the cash had the immediate appearance of wrongdoing. In *United States v. Law*,

the Third Circuit conducted a wide review of federal law governing the seizure of cash under the plain view doctrine and concluded that the police's seizure of cash—absent "testimony that [the officer] thought the cash was incriminating or had anything to do with drugs"—is inappropriate under the doctrine. 384 F. App'x 121, 122-23 (3d Cir. 2010) (collecting cases). The court's rationale was that cash, in and of itself, is innocuous, even in large bundles and wrapped in rubber bands—only additional evidence creating a suspicious context can show it is immediately apparent that such money is incriminating. *Id*. Here, the police presented no testimony as to why they seized Mr. Dyer's cash. The government has thus failed to carry its burden of showing Detective Baker believed it was immediately apparent the cash was inculpatory.

Next, the United States has put forward no evidence to support its acquisition of "1 Drug paraphernalia."[10] During the evidentiary hearing, Detective Baker stated that he did not recall what items they seized that fall under the category of drug paraphernalia. He did not indicate where he located them or what about them suggested they were paraphernalia, thus giving rise to an immediate appearance of wrongful conduct. As such, the government has not carried its burden of showing

---

[10] The fact that the police recorded seizing "1 Drug paraphernalia"—and the officer who supposedly seized the paraphernalia could not even testify as to what objects fell into this category—suggests the York police employed an alarmingly lax and disorganized standard of recording the items acquired during a search.

the plain view doctrine justified the seizure of such evidence; any materials acquired during the first search under the category of "drug paraphernalia" are thus inadmissible at trial.

Turning to the Swann DVR, charger, and flash drives, it appears the police located all of these while properly searching the house, but the Government has not carried its burden of showing that it was immediately apparent that these items contained evidence of contraband. In determining whether the incriminating nature of any items was immediately apparent, the court must not hold police to "an unduly high degree of certainty as to the incriminatory character of evidence." *Texas v. Brown*, 460 U.S. 730, 741 (1983). Instead, the court must determine whether, from the perspective of the officer and the degree of observation they took before seizing the object, there was probable cause that the item contained, or was itself, incriminating evidence. *See id.* The United States Supreme Court has held that merely seeing stereo equipment—even with knowledge stereo equipment was stolen nearby—or feeling a lump in a suspect's pocket are insufficient factual bases from which the police might find the immediate appearance of wrongful conduct. *See Minnesota v. Dickerson*, 508 U.S. 366, 378-79 (1993).

In *United States v. Wilson*, the United States Court of Appeals for the Eighth Circuit considered whether, under *Arizona v. Hicks*, the seizing of a camera, cell phone, and video tape was permissible under the plain view doctrine. 565 F.3d 1059,

1065 (8th Cir. 2009). Wilson argued that merely by observing the outside of the devices, the police could not reasonably believe the items contained evidence of illegal conduct. *Id.* The court rejected this challenge, finding the officers there had probable cause to believe the recording devices contained evidence of criminal conduct because: (1) the officers were aware of testimony from a victim that the recording devices were used to record underage sexual activity; (2) the devices were located in the exact place described by the victim; and (3) the officers had reviewed images of the recording devices before conducting the search. *See id.*; *see also Glick v. Edwards*, No. 11-cv-168, 2012 WL 2524975, at *4 (D. Mont. June 29, 2012) (describing the holding of *Wilson* as turning on the fact that "the officer knew a child pornography victim had alleged such items had been used to record her and the video camera was found in the same location the victim had described").

In contrast to the on-point evidence in *Wilson*, the officers' testimony here as to why they seized these recording devices is flimsy. The officers did not testify that they were privy to any testimony by a victim as to what information would be found on this DVR device. They did not locate the recording devices in any position described by a victim. And the officers did not testify that they had a sufficient basis to believe the devices immediately and apparently contained contraband; instead, they testified that they seized the devices "as just a precautionary measure since it's a digital piece of equipment and it's easily disposed," and because it was their "hope"

that it contained incriminating evidence. While one officer did testify he believed the location of the cameras in the house suggested they "might have caught a lot of the incident as it occurred," the officer did not explain what he means by this, why he believes that, or how he came to believe the DVR was recording data from those cameras.

Similarly, the flash drives were seized simply because "they were computer items" that "were seized within the same area as the weapons and the cash and everything else." It is unclear why the flash drives being near "weapons" would lead the police to believe they had any evidence of wrongdoing. During the evidentiary hearing, the Assistant United States Attorney, Michael Consiglio, did ask: "Was there thoughts maybe that flash drives contained storage information associated with the surveillance," in response to which the officer stated, "That's correct." (Doc. 127, 78:23-25.)[11] But the fact that the officer had "thoughts" that "maybe" the flash drives contained possibly incriminating evidence is pure speculation, not a

---

[11]   Defendant complains that Mr. Consiglio "spoon fed" the officers the answers he was seeking. As a factual matter, Defendant is correct. But the legal phrase Defendant is looking for is that Mr. Consiglio employed "leading questions"—an objection that is now waived because he did not object to these questions during the hearing. *See Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 770 (3d Cir. 1975). Upon its own review of the officers' testimony, however, the court is suspicious of the fact that the officers were, at times, willing to affirmatively respond to Mr. Consiglio's conslusory and leading questions, even when they admitted they had no recollection of what he was asking about. (*See* Doc. 127, 77:1-7 (after admitting he did not recall what any of the items labeled "drug paraphernalia" were, Detective Baker was willing to testify that it was immediately apparent all of those items were incriminating).) The court nonetheless does consider all of the officers' testimony together.

reasonable and immediate appearance of inculpatory evidence on the flash drives. Subjective consideration that it is possible an item could contain incriminating evidence does not meet the admittedly low bar of probable cause. Thus, the government has not carried its burden of showing, by a preponderance of evidence, that it was immediately apparent that the recording devices or flash drives contained incriminating evidence.

Turning to the plastic sandwich bags found in the freezer, the court finds these were located in a space the police did not have constitutional authority to enter. In *United States v. Telfair*, the Third Circuit held that an officer was permitted to open a refrigerator, under the plain view doctrine, because he "had probable cause to believe the appliance both was and contained incriminating evidence." 507 F. App'x 164, 173 (3d Cir. 2012). Specifically, the police had reason to believe there may be shell casings in the refrigerator because they had been called to the house because of a shooting in the kitchen area, and because the refrigerator had bullet holes in it. *Id.* Here, the police had no basis for believing the freezer was or contained incriminating evidence. As shown above, the police only had a good-faith basis for searching for a gun and cell phones. The police claim they located the bags inside the freezer, suggesting they had to open the freezer door to locate them. Because the police had no basis for believing the freezer contained a gun or cell phones, they

did not have a justification for opening the freezer. The plain view doctrine did not justify them locating or seizing the sandwich bags.

Regarding the plastic Apple-brand packaging, box of green pills, and an identification card for a "T. Holmes," the police gave some testimony suggesting it was immediately apparent these items were evidence of criminal activity. The court finds that a reasonable person could have probable cause to conclude unmarked pills next to Apple-brand packaging is evidence of illegal activity. The officers here testified, without any rebuttal, that, in their experience, Apple-brand packaging is regularly used to store and sell drugs. And a person's identification next to these materials could be evidence of the person who was selling said drugs. But the officers gave no testimony regarding exactly where these items were located in the house. The court thus looked elsewhere in the record to glean where the items were located.[12]

On the day following the issuance of the warrant, Detective Baker filed a supplemental narrative outlining the officers' executions of the warrant. (*See* Doc. 116-2, p. 42.) This document includes a line stating "Box containing green pills,

---

[12]  Ordinarily, it is the job of the parties to "point the court to record evidence supporting" the factual basis for its arguments. *Cf. Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994) (discussing the parties' summary judgment briefing obligations). But, because Defendant did not rebut by brief the Government's invocation of the plain view doctrine, the court finds it understandable that the Government did not fully brief the matter in its supplemental brief. The court thus is attempting to diligently review the record to conduct its own comprehensive analysis of the facts. But its decision to do so should not be seen a basis for alleviating the parties from, in the future, pointing the court to the needed facts in the record.

drug packaging material and ID of T. Holmes – Bedroom of T. Holmes on shelf."

The court finds this is a sufficient factual basis to justify the police locating it in

plain view during a legal search. Incident to the arrest of the suspects, the police

properly conducted a quick search of all rooms and closets in the house to secure the

premises from any possible threats. *See Grayer v. Twp. of Edison*, 198 F. App'x

203, 208 (3d Cir. 2006) (citing *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). The

fact that the materials were on the "shelf" does not tell the court much. But,

unrebutted, it is enough for the court to conclude that it was more likely than not that

the police were able to spot them merely by conducting a quick scan. The court

therefore shall not exclude the use of these pieces of evidence.

Regarding the "Black padfolio with papers," the government has not put forth

sufficient evidence to show it was immediately apparent these documents were

evidence of illegal activity. Several cases have held that "a document, even though

in plain view, is [not] within the plain view exception if it must be read in order for

its incriminating nature to be determined." *United States v. Garcia*, 496 F.3d 495,

510 (6th Cir. 2007) (holding receipts, financial records, and invoices that the officer

had to read before he could determine they were evidence of wrongdoing did not fall

within the plain view doctrine); *see, e.g. Gleeson v. Prevoznik*, 190 F. App'x 165,

167 (3d Cir. 2006) (affirming the district court's finding that a detective failed to

show "the incriminating character of the documents was immediately apparent, as

required by the plain view doctrine"); *United States v. Andrews*, 847 F. Supp. 2d 236, 253 (D. Mass. 2012) (excluding documents that police had to read to determine if they were incriminating); *United States v. Reeves*, No. 11-cr-520, 2012 WL 1806164, at *10 (D.N.J. May 17, 2012) (excluding digital items whose filenames were in plain view, but whose content had to be read to determine if they were incriminating).

In *United States v. Menon*, the police were authorized by warrant to search a house for blank invoices bearing the name "Abad Fisheries," a phony seafood supplier. 24 F.3d 550, 559 (3d Cir. 1994). A senior officer nonetheless instructed the officers executing the warrant to also "look for any other blank invoices and for documents regarding" another company named "Jabeco." *Id.* In executing the warrant, one officer searched a desk for blank invoices with the name "Abad Fisheries," but also came upon a document with the name "Jabeco" and turned it over to the senior official. *Id.* The senior official then read the entire document and inferred, from a prior investigation, that these documents and others were evidence of a scheme of illegal food shipments. *Id.*

The defendant moved to suppress the Jabeco documents, arguing that, under *Arizona v. Hicks*, the police had improperly sifted through and closely read documents before ascertaining they were evidence of wrongdoing, demonstrating it was not "immediately apparent" that they were incriminating. *Id.* at 560-63. The

Third Circuit held that the issue was a close call, and that the defendant put forward a "forceful" argument that a cursory examination of documents conducted during an otherwise legal search did not give rise to an immediately apparent impression of wrongdoing, and thus further reading the documents was impermissible under the plain view doctrine. *Id.* The court nonetheless held it was proper for the police to read the document because they had to do so in order to determine whether they were blank invoices with the name "Abad Fisheries" on them—an act expressly authorized by the warrant. *Id*; *see also United States v. Baker*, No. 3:13-cr-197, 2015 WL 13307591, at *7 (M.D. Fla. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7068145 (M.D. Fla. Nov. 13, 2015) (holding that *Menon* stands for the proposition that an officer can review documents if it is authorized, by a warrant, to look for certain documents in the residence).

Here, Detective Baker testified that:

> There was, so the pad folio containing receipts. The receipts did not appear to legitimate for lack of a better word. They looked like they were made up receipts or it might have been something involving the drug trafficking trade like he was trying to keep track of how much was being sold to certain people in certain ways that way.

(Doc. 127, 77:11-16.) On its face, this testimony does not show Detective Baker had anything more than an intuitive hunch that something might be wrong with some receipts. This is a sufficient basis to show he did not find it immediately apparent that the documents were incriminating. But, even assuming his gut feeling was

enough, his testimony reveals that he had to open the padfolio and read the materials inside of it to ascertain whether the documents hinted at incriminating activity. Moreover, in contrast to the police in *Menon*, the officers here were not authorized by the warrant to search for any documents.[13] Thus, Detective Baker's conduct of opening the pad folio is closer to the officers in *Hicks* and *Mitan* who had to move materials around to identify incriminating evidence. *United States v. Mitan*, Nos. 08-760-1, 08-760-2, 2009 WL 2195321, at *17 (E.D. Pa. July 23, 2009) ("Strosnifer testified that he moved some of the documents around to further identify them; moving documents around also supposed the conclusion that their incriminating nature was not immediately apparent."). Moreover, the fact that he had to read the receipts to come to his conclusion that they seemed like recordings of drug deals renders his conduct in line with the officers in the cases excluding documentary evidence. As such, the court finds the plain view doctrine did not permit the police to seize the padfolio or documents contained therein, and they should be excluded.

### F. The second warrant is amply supported by a valid affidavit that does not rely upon any fruit of the poisonous tree.

Here, Magistrate Judge Carlson issued a second warrant based on an eight-page long, well-drafted affidavit by Special Agent Ryan Anderson, laying out his thorough basis for believing additional drugs could be found in a specific location

---

[13] The government has not argued that the officer was looking for drugs, phones, or guns—the items actually authorized to be searched for in the warrant—in the padfolio.

in the house. Specifically, Ms. Bechtold testified, *inter alia*, that Mr. Grant had informed her he hid drugs on a specific outer window sill. The officers found the exact drugs in question in the exact location predicted. Defendant does not question the sufficiency of the affidavit, so the court will not explore it further.

Instead, Defendant raises two complaints: (1) that the second search was not executed for days after he was arrested and other people moved into the house, so the drugs could have belonged to someone else; and (2) that the second warrant was based on fruit of the poisonous tree because the affidavit in support relied upon evidence acquired during the first search, which was wholesale illegal.

The first argument does not adequately call into question Judge Carlson's basis for finding probable cause. The evidence being days old is an insufficient basis to void probable cause. *See United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (holding a two-month old letter was not stale and thus served as a valid basis for establishing probable cause). And the fact that other people moved in does not negate the fact that there may still have been drugs located where Mr. Grant hid them. If the Government is unable to trace the chain of possession to Mr. Dyer, this argument may serve as part of a valid basis for excluding the evidence for a separate reason. Or it may serve as a persuasive trial argument. But it is not a basis for concluding Judge Carlson lacked probable cause to issue the warrant when he did. The second argument fails because the court has reviewed the affidavit in support of

the second warrant and does not find it relied upon any evidence the court has excluded. Instead, the second affidavit relies primarily on the testimony of Ms. Bechtold, who the police would have been authorized to arrest and question due to the partial validity of the first warrant and due to her having an outstanding bench warrant. Defendant has thus failed to raise a meritorious objection to the second warrant and all evidence acquired during the second search was seized in a constitutionally-permissible way.

In deciding the second search warrant was valid, the court considered whether this meant the discovery of the original items would have been inevitable. The government, however, bears the burden of proof regarding the applicability of the inevitable discovery doctrine and did not raise the argument in its brief or explain what evidence it believed would have supported such a finding; the court therefore will not permit the introduction of the evidence on that basis. *See United States v. Bradley*, 370 F. Supp. 3d 458, 476-77 (M.D. Pa. 2019) (citing *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). Even if the court did consider this argument, there is insufficient evidence in the record to support a finding of inevitability. While executing the second warrant, the police searched for but were unable to locate some evidence of contraband that Ms. Bechtold stated they would find. This could be explained by the passage of time between Mr. Dyer's arrest and execution of the second warrant, during which time other people—including

mothers who likely would remove or destroy such contraband from a house where their children lived—were occupying the premises. As such, a finding of inevitability would require impermissible speculation on the court's part. As this court recently explained:

> Speculation and assumption do not satisfy the dictates of [the Supreme Court's decision in] *Nix* . . . inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof.

*Id.* (quoting *Vasquez De Reyes*, 149 F.3d at 195) (citing *Nix v. Williams*, 467 U.S. 431 (1984)).

## IV.    CONCLUSION

For the reasons outlined above, the court shall grant the motion in part, excluding the Swann DVR and charger, cash, drug paraphernalia, black padfolio with paperwork and receipt book, flash drives, and clear empty sandwich bags. The motion is denied in all other regards. An appropriate order shall follow.

*/s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: November 21, 2019